UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LEIGH WOLF,

       Plaintiff,

v.                               Case No:   2:12-cv-318-FtM-38CM

MWH CONSTRUCTORS, INC.,

       Defendant.

_____/

**ORDER**[1]

This matter comes before the Court on Defendant MWH Constructors, Inc.'s Dispositive Motion for Summary Judgment (Doc. #56) filed on June 20, 2014. Plaintiff Leigh Wolf filed an Opposition to Defendant's Motion for Summary Judgment (Doc. #60) on July 3, 2014. Defendant also filed a Reply to Plaintiff's Opposition (Doc. #66) on July 18, 2014, and Plaintiff thereafter filed a Surreply to Defendant's Reply (Doc. #69) on July 23, 2014. Thus, this matter is ripe for review.

**BACKGROUND**

**I.    Plaintiff's employment with Defendant**

On April 17, 2000, MWH Americas, Inc. ("MWH Americas"), Defendant's sister company, hired Plaintiff as an intern. (Pl.'s Dep. 8:24-9:3). When Plaintiff graduated from

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the Court has no agreements with any of these third parties or their Web sites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

college in 2001, MWH Americas hired her full time as a project engineer.  (Pl.'s Dep. 9:4-15).  In late 2006, Plaintiff transferred to Defendant and became a senior project engineer. (Pl.'s Dep. 9:23-10:5).  At that time, Defendant was managing the construction of water treatment plants, water reclamation facilities, and wells for the City of Cape Coral, Florida (collectively referred to as "the Cape Coral projects").  (Doc. #56 at 2).  Michael P. Holt served as Defendant's Eastern Regional Manager for Municipal Construction Services from February 2006 to February 2008, and his office was in Atlanta, Georgia.  (Holt Decl., ¶ 1).  In this capacity, Holt headed the Cape Coral projects.  (Id.).  Larry Laws, the Division Construction Manager for the Cape Coral projects, reported to Holt.  (Laws Decl., ¶ 1).

The specific Cape Coral project for which Plaintiff worked was the North Cape RO Water Treatment Plant (the "North Cape project").  (Pl.'s Dep. 11:18-20, 12:6-15).  The North Cape project entailed Defendant building a reverse osmosis water treatment plant and ancillary wells.  (Pl.'s Dep. 12:10-15).  Defendant assigned approximately fifteen to seventeen employees to this project.  (Rowley Decl., ¶ 2).  Pertinent to this action is Jack Currie, who was the Senior Project Manager for the North Cape project until his discharge on August 29, 2007.  (Laws Decl., ¶ 6).  Currie reported to both Holt and Laws.  (Holt Decl., ¶ 6).  Also relevant is Shon Fandrich, a Project Manager for the North Cape project. (Fandrich Decl., ¶ 1).   Plaintiff principally reported to Currie, but, at times, she also reported to Fandrich.  (Holt Decl., ¶ 6; Fandrich Decl., ¶ 2).

Officially, Plaintiff worked as a senior project engineer on the North Cape project until her resignation on June 11, 2008.  (Pl.'s Dep. 14:3-10).  Her primary duties consisted of engineering tasks such as interfacing between the design and construction teams, answering vendors' information requests, writing change orders, and coordinating other

communications between the subcontractors and the client.  (Doc. #56 at 4-5).  Plaintiff, however, claims she was a senior project engineer in name only because she unofficially managed projects from design through construction and supervised staff.  (Doc. #60 at 10; Pl.'s Dep. 41:8-12).

Several specific instances of Plaintiff's employment are pertinent in this action, which the Court will detail in turn.

A.  The W-2C project

Shortly after Plaintiff started working for the North Cape project, Currie assigned her to the ancillary W-2C project.[2]  (Pl.'s Dep. 70:20-25).  The parties offer competing narratives on Plaintiff's precise role in this project.  Plaintiff maintains she acted as a project manager until approximately July 2007, although she did not have that job title. (Pl.'s Dep. 41:8-15, 72:16-20).   According to Plaintiff, Holt, "[w]ithout warning, cause, or provocation," ordered Currie to remove her from this managerial post and replaced her with John Petrous, who had inferior credentials.  (Doc. #60 at 3, 30; Pl.'s Dep. 68:1-25). Plaintiff's compensation, benefits, and job title did not change when Petrous was assigned to the W-2C project.  (Pl.'s Dep. 75:4-8).   Defendant, however, contends Plaintiff temporarily assisted Currie on the W-2C project while Holt searched for an individual to fill that position permanently.  (Holt Decl., ¶ 14).  Holt then internally hired Petrous to manage the W-2C project, as he had significant experience in this area.  (Id.).

---

[2] The W-2C wells project entailed drilling raw water production wells that would serve as the water sources for the North Cape RO Water Treatment Plant.  (Pl.'s Dep. 69:3-24).  When Plaintiff joined this project, approximately seventy-five percent (75%) of the wells had been drilled.  (Pl.'s Dep. 69:25-70:13).

B.  <u>Plaintiff's internal career development</u>

Defendant has an internal personnel and job classification system, titled "CareerTrack."  (Rowley Decl., ¶ 7; Pl.'s Dep. 77:8-13).  Under this system, employees are classified based on objective criteria like job requirements, skills, education level, and experience.  (Rowley Decl., ¶ 7).  CareerTrack allows Defendant to assign the appropriate employees to projects so the projects' and clients' needs are met.  It also provides employees transparency on their job requirements and possible career advancements.  (Id.).

CareerTrack groups jobs with similar requirements into six "families."  Within each family there are "career levels" that represent the education, experience, and leadership skills required of a job at that level.  (Id.).  Pertinent here, the "Technology family" is composed of engineering, design, and technical support professionals; whereas the "Project Management" family is composed of employees involved in construction management and actual construction.  (Id., ¶ 8).  It is common for employees to move between the families.  (Doc. #56 at 3).  Also, because Defendant's employees collaborate on projects, it is common for a Technology family employee to assist with or perform duties normally performed by a Project Management employee.  (Id., ¶ 8).

When Plaintiff joined Defendant as a senior project engineer, she was assigned to the Technology family.  (Id., ¶ 9).  Plaintiff, however, requested to be reclassified to the Project Management family sometime in December 2006.  (Doc. #60 at 28).  On December 15, 2006, Shon Fandrich emailed Plaintiff to discuss her request.  (Doc. #60 at 28).  Defendant decided Plaintiff needed more onsite experience managing

construction projects before she qualified for a project manager position.  (Rowley, ¶ 9; Holt Decl., ¶¶ 7, 15).

On May 18, 2007, Holt emailed Dana Dorr, a member of Defendant's Human Resources department, asking what he needed to do to transfer Plaintiff to the Project Management family because it was "certainly appropriate that she be reclassified."  ([Doc. #56-3 at 6](#)).  Plaintiff was carbon copied on this email.  ([Doc. #56-3 at 6](#)).  On June 1, 2007, Plaintiff followed-up with Holt about her reclassification because she had not received a response from Dorr.  ([Doc. #56-3 at 5](#)).  Holt responded, "[d]ue to the myriad of America's classifications I was having trouble flanging up your title with the appropriate Constructor's title in the technical family.  I will try to talk to Jack [Currie] and Dana [Dorr] today to get this flattened out."  ([Doc. #56-3 at 5](#)).

On June 13, 2007, Plaintiff met with Holt to discuss her career goals and her request to transfer to the Project Management family.  ([Doc. #60 at 26](#)).  According to Plaintiff, Holt denied her transfer request but encouraged her to pursue a career in project management and participate in project management training.  ([Doc. #60 at 26](#); Holt Decl., ¶ 7).  Sometime after this meeting with Holt, Plaintiff apparently contacted Ed Hernandez from Defendant's Human Resources department to inquire about transferring to the Project Management family.  ([Doc. #60 at 26](#)).  According to Plaintiff, Hernandez explained to her, because of her experience and qualifications, she should be part of the Project Management family and manage projects.  ([Doc. #60 at 26](#)).

C.  Plaintiff's "Executive Risk Call" presentation

Sometime around June 2007, Plaintiff presented, for the first time, at an "Executive Risk Call" with upper management.  (Pl.'s Dep. 157:14-16).  Some managers participated

remotely and others participated in-person at the Cape Coral, Florida location with Plaintiff.  Holt participated by telephone.  (Holt Decl., ¶ 16).  When Holt heard Plaintiff begin to present, he telephoned Mike Kaner, who was participating in-person, and said something to the effect of "[w]hat the hell is Leigh Wolf doing leading this presentation? Get her off the call and get Jack Currie on the call."  (Holt Dep. 63:19-18).  Plaintiff and the in-person participants heard Holt's comment.  (Pl.'s Dep. 148:13-25).  Holt was surprised and upset that Plaintiff, and not Currie, was leading the call because Currie was the assigned Senior Project Manager.  (Holt Decl., ¶¶ 5, 16; Pl.'s Dep. 159:20-23). Although embarrassed by Holt's statement, Plaintiff continued her presentation.  (Pl.'s Dep. 148:13-149:7).  Holt later apologized for his unprofessional behavior but Plaintiff does not recall the apology.  (Pl.'s Dep. 159:4-7; Holt Dep. 65:15-66:9).

### D.  Plaintiff's training opportunities

In or around May 2007, Holt met with various male individuals from the Cape Coral projects. (Pl.'s Dep. 145:18-25).  Plaintiff and another female employee were not invited to this meeting. (Pl.'s Dep. 51:15-24).  Plaintiff does not know whether Holt held a meeting or training session, but she considered Holt to have conducted training.  (Pl.'s Dep. 145:18-25).

Additionally, around July 2007, Defendant released the fourth module of its internal "Manage the Project" training program ("MTP"), which was a multi-day training session intended for existing project managers.  (Pl.'s Dep. 50:9-18, 52:14-20; Rowley Decl., ¶¶ 10, 12; Holt Decl., ¶ 4).  Although Defendant invited Plaintiff to attend the first three, she was not invited to the fourth.  (Pl.'s Dep. 51:10-14).

## II.   Plaintiff's sex discrimination complaint and the aftermath

On August 17, 2007, Plaintiff emailed Holt to discuss why she had not been invited to participate in the fourth MTP module and removed from the W-2C project.  (Doc. #60 at 26).  Plaintiff wrote, in pertinent part:

> I cannot help but feel I am being blatantly discriminated against by being stripped of project management duties (on the W-2C project which I had been successfully managing since my transfer into Constructors, and from which I was removed as project manager and a person with far less qualifications was given responsibility for), as well as being denied training opportunities on more than one occasion.

(Doc. #60 at 26).  Plaintiff continued "in the nine months I have been with Constructors I believe my opportunities for advancement and success are being limited by the fact that my qualifications, skills and experience are being disregarded, and that my career goals are not being taken seriously by you."  (Doc. #60 at 26).  This was the first time Plaintiff complained of sex discrimination to Defendant.  (Pl.'s Dep. 143:3-9).  Shortly thereafter, Plaintiff met with Dana Dorr and they spoke briefly about her email to Holt.  (Pl.'s Dep. 108:15:20, 111:1-112:12).

On August 29, 2007, Plaintiff met with Dorr and Larry Laws, where they asked Plaintiff about her personal relationship with Currie.[3]  (Pl.'s Dep. 113:20-25; 114:2-4, 18-22).  They warned her that answering dishonestly on the matter would result in her discharge, as they had just discharged Currie for lying about their romantic involvement.  (Pl.'s Dep. 114:18-115:25).  Plaintiff perceived this warning as an intimidation tactic so she would not pursue her sex discrimination complaint.  (Pl.'s Dep. 108:25-109:3).

---

[3] Rumors had circulated around April 2007 that Currie and Plaintiff had a romantic relationship, which they denied.  (Doc. #60 at 27; Pl.'s Dep. 118:10-18; Holt Decl., ¶ 12; Fandrich Decl., ¶ 5).  Sometime later, Defendant obtained evidence confirming their relationship and they discharged Currie on August 29, 2007.  (Doc. #56 at 7).

After the meeting, Plaintiff called Dorr and asked if Currie's dismissal was Defendant's response to her sex discrimination concerns. (Pl.'s Dep. 109:4-10; Doc. #60 at 11). Dorr explained that Currie's dismissal had nothing to do with her concerns and he would contact her later to further discuss that matter. (Pl.'s Dep. 109:4-9). Dorr did not follow up with Plaintiff. (Pl.'s Dep. 109:9-10).

Sometime after August 29, 2007, Fandrich did not give Plaintiff a performance evaluation. (Pl.'s Dep. 138:14-21). After Plaintiff complained about not receiving the evaluation, Roy Bumpass, the facilities manager on the North Cape project, evaluated her. (Id. 135:22-23). According to Plaintiff, "Bumpass was unprepared for the evaluation, did not review [her work], and indicated [she] was reputedly arrogant and unapproachable in the review." (Doc. #60 at 9)

Also of note is that sometime after February 2008 Plaintiff was randomly selected for a drug test. (Pl.'s Dep. 239:19-24; Doc. #56-2 at 6). Defendant has a substance abuse policy that involves quarterly drug tests, and a third-party company randomly selects and tests the employees. (Rowley Decl., ¶ 14; Doc. #56 at 4).

On June 11, 2008, Plaintiff resigned from her position with Defendant. (Doc. #56-2 at 5). Almost one month later, she joined Black and Veatch, a global engineering consultant company, and began working in Afghanistan. (Pl.'s Dep. 146:24-147:1).

## III.   Charge of Discrimination and federal lawsuit

On December 22, 2008, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination and retaliation. (Doc. #60 at 29-31). On March 12, 2012, the EEOC issued Plaintiff a right to sue letter. (Doc. #12 at 17). Plaintiff thereafter commenced this employment

discrimination action on June 11, 2012.  (Doc. #1).  In the two-count complaint, Plaintiff alleges Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et. seq. ("Title VII"), and the Florida Civil Rights Act of 1992, Ch. 760, Fla. Stat. ("FCRA")[4] by discriminating against her based on sex and retaliating against her for complaining of sex discrimination.  (Doc. #12).   Defendant now moves for summary judgment on both claims.  (Doc. #53

## **STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Similarly, an issue of fact is material if it may affect the outcome of the suit under governing law.  Id.

The moving party bears the burden of showing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In deciding whether the moving party has met this initial burden, courts must review the record and draw all reasonable inferences from the record in a light most favorable to the non-moving party.  See Whatley v. CNA Ins. Co., 189 F.3d 1310, 1313 (11th Cir. 1999).  Once the court determines the moving party has met this burden, the burden shifts to the non-moving party to present specific facts showing a genuine issue of fact exists to preclude

---

[4] In the Amended Complaint, Plaintiff also alleges this action arises under 42 U.S.C. § 1981a.  (Doc. #12 at 1).  Section 1981a protects against race discrimination.  See 42 U.S.C. § 1981a ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, . . .").  Since Plaintiff has not alleged race discrimination, she has no claim under 42 U.S.C. § 1981a.

summary judgment.  See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial."  Demyan v. Sun Life Assurance Co. of Can., 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)).  Failure to show sufficient evidence of any essential element is fatal to the claim and the court should grant the summary judgment. See Celotex, 477 U.S. at 322-23.  Conversely, if reasonable minds could find a genuine issue of material fact then summary judgment should be denied.  See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992).

## DISCUSSION

Defendant moves for summary judgment on the following grounds: (1) many of the discriminatory and retaliatory acts on which Plaintiff brings this action are time-barred; (2) Plaintiff cannot establish a *prima facie* case of sex discrimination; and (3) Plaintiff cannot establish a *prima facie* case of retaliation.  (Doc. #56 at 1-2).  The Court will address each argument in turn.

**I.    Timeliness**

Before commencing a Title VII action in federal court, a plaintiff in a deferral state like Florida must file an administrative charge of discrimination within 300 days of the last discriminatory act.  See 42 U.S.C. § 2000e-5; E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271 (11th Cir. 2002).  Alternatively, a plaintiff may file an administrative complaint with the Florida Civil Rights Commission within 365 days after the purported discriminatory act.  See Fla. Stat. § 760.11(1).  Either way, a plaintiff cannot recover for discrete acts of discrimination and retaliation that occur outside the applicable statutory

time period.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113.  Discrete acts "are easy to identify" and include "termination, failure to promote, denial of transfer, or refusal to hire." Morgan, 536 U.S. at 114

The continuing violation doctrine offers an exception to this limitation period and allows a plaintiff to sue on otherwise time-barred claims where at least one violation occurred within the period.  See Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1221 (11th Cir. 2001).   "In determining whether a discriminatory employment practice constitutes a continuing violation, '[the court]' must distinguish between the present consequence of a one-time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does." Joe's Stone Crabs, 296 F.3d at 1271 (citation omitted).  "[A] plaintiff may not circumvent the limitations period merely by labeling an act a 'continuing' violation.  Completed acts such as a termination . . . are not acts of a 'continuing' nature.  Rather, a plaintiff must maintain that a pattern of discrimination or an employment practice presently exists to perpetuate the alleged wrong." Jacobs v. Bd. of Regents, 473 F. Supp. 663, 669 (S.D. Fla. 1979) (internal quotations and citation omitted).  The continuing violation "doctrine does not apply to discrete acts of discrimination, such as a promotion denial or refusal to hire." Brooks v. CSX Transp., Inc., No. 13-12048, 2014 WL 480382, at *2 (11th Cir. Feb. 7, 2014) (citing Morgan, 536 U.S. at 114).  With these principals in mind, the Court will turn the timeliness of Plaintiff's alleged discriminatory and retaliatory acts.

Plaintiff filed her EEOC charge on December 22, 2008.  Consequently, all discrete discriminatory and retaliatory acts that occurred before March 3, 2008, for Title VII purposes, and December 22, 2007, for FCRA purposes are untimely filed, no longer actionable, and outside the scope of the action.  See Joe's Stone Crabs, 296 F.3d at 1271.  Based on the undisputed record evidence, the following discrete acts cannot form the basis of Plaintiff's sex discrimination and retaliation claims: (1) Holt did not invite Plaintiff to attend his April 2007 training or the MTP training in June/July 2007; (2) Holt embarrassed Plaintiff during the "Executive Risk Call" in or around June 2007; (3) Holt supplanted Plaintiff's unofficial managerial duties on the W-2C when he hired John Petrous in or around June/July 2007; (4) Defendant did not transfer Plaintiff to the Project Management family in June 2007; and (5) Defendant denied her objective job progression criteria and formal job descriptions through August 2007.  At most, these acts may provide relevant background and overall context to Plaintiff's claims.

Plaintiff turns to the continuing violation doctrine in an attempt to rescue the above alleged discriminatory and retaliatory acts.  (Doc. #56 at 17).  The Court finds Plaintiff's attempt unpersuasive because she simply labels those acts as "continuing violations" and declares victory.  See Jacobs, 473 F. Supp. at 669.  For example, she maintains that the "instances leading up to the charge all flow out of the same series of events and occurrences."  (Doc. #60 at 7).  However, conspicuously absent from Plaintiff's papers is a minimum assertion that Defendant engaged in a pattern of discrimination or had an employment practice that perpetuated the alleged wrong.  At this stage in the litigation, Plaintiff needs more than mere allegations to salvage her otherwise time-barred discriminatory or retaliatory acts.

Accordingly, in assessing whether Plaintiff's sex discrimination and retaliation claims survive summary judgment, the Court will only consider those alleged acts that fall within the actionable periods set forth above.

## II.   Sex discrimination under Title VII and FCRA

In Count I of the Amended Complaint, Plaintiff alleges Defendant intentionally discriminated against her on the basis of her sex in violation of Title VII and the FCRA.[5] Title VII prohibits employment discrimination on the basis of sex.  See 42 U.S.C. § 2000e-2(a)(1).  In cases involving circumstantial evidence of discrimination, as here, the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), typically applies.[6]  See Blom v. WellStar Health Sys., 560 F. App'x 950 (11th Cir. 2014).

Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  See Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012).  This requires her to present sufficient evidence that (1) she is a member of a protected class; (2) she was qualified to do the job; (3) she was subject to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably.  See Johnson v. Sec., U.S. Dep't of Veterans Affairs, 517 F. App'x 933, 935 (11th Cir. 2013) (citing McDonnell Douglas, 411 U.S. at 802).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  See Holland, 677 F.3d at

---

[5] The Court's analysis of Plaintiff's sex discrimination claim under Title VII applies equally to her claim under the FCRA.  See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1271 (11th Cir. 2010) (stating discrimination claims under the FCRA are generally subject to the same legal standards as claims based on Title VII); Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the [FCRA], because the Florida act was patterned after Title VII." (citations omitted)).

[6] Plaintiff has neither offered direct evidence of sex discrimination nor argued that such evidence exists.

1055.  The defendant's burden is one of production, not of persuasion.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004) (stating the defendant "need not persuade the [finder of fact] that it was actually motivated by the proffered reasons"). Once the defendant articulates a legitimate, nondiscriminatory reason, the presumption of discrimination disappears, and the burden shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); see also Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (stating rebuttal evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence").

In this case, Defendant argues Plaintiff cannot meet the last two elements of her *prima facie* case, i.e., she did not suffer an adverse employment action and she was not treated less favorably than a similarly situated employee outside her protected class.

A.  Adverse employment action

For purposes of Title VII discrimination, an adverse employment action occurs when an employer's action affects the compensation, terms, conditions, or privileges of the plaintiff's employment in a real and demonstrable way.  See 42 U.S.C. § 2000e-2(a)(1); Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001).  Since Title VII is not "a general civility code" for the workplace, Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000), only "materially" adverse conduct is actionable.  See Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 69 (2006); Davis, 245 F.3d at 1238.  Thus, a plaintiff must show "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 742, 760 (1998). Importantly, not everything that makes an employee unhappy is an actionable adverse action, Davis, 245 F.3d at 1238, and district courts do not "sit as a super-personnel department that reexamines an entity's business decisions," Denney v. City of Albany, 247 F.3d 1172, 1188 (11th Cir. 2001).

As discussed previously, Plaintiff has alleged a myriad of ways in which Defendant adversely treated her because of her sex: (1) denied her training opportunities; (2) stripped of her unofficial managerial duties for the W-2C project; (3) denied her objective job progression criteria and formal job descriptions; and (4) constructively discharged her. (Pl.'s Dep. 46:16-47:20, 76:23-77:4, 85:24-86:6, 95:5-15, 198:16-23). Except for constructive discharge, these alleged adverse employment actions are untimely for the reasons stated above and cannot form the basis for a sex discrimination claim.[7] The Court, therefore, turns to whether Plaintiff has established that her constructive discharged constitutes an adverse employment action.

For a plaintiff to demonstrate constructive discharge, she must show "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Johnson v. Woodruff, 28 F. Supp.

---

[7] Even if the Court were to ignore Title VII's limitations period, which it will not, Plaintiff concedes Defendant never decreased her compensation and benefits, she never applied for a promotion, and Holt encouraged her to pursue a career in project management. (Pl.'s Dep. 219:7-24; Doc. #60 at 26). Defendant also never reassigned or demoted Plaintiff to a position with significantly different responsibilities, as she remained a senior project engineer throughout her career with Defendant. (Pl.'s Dep. 14:3-10). Moreover, Plaintiff cannot rely on Currie's statements to her about what Holt had allegedly said to him to argue Holt was bias against female employees. (Pl.'s Dep. 181:7-183:15, 186:20-187:9). Such anecdotal evidence of discrimination is based upon inadmissible hearsay and/or a lack of personal knowledge that the Court cannot consider in determining a motion for summary judgment. See Fed. R. Civ. P. 56(c); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

2d 1248, 1250 (M.D. Fla. 1998) (citing Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1363 (11th Cir. 1994)).  "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."  Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) (citations omitted).

According to Plaintiff, "leaving the United States for the war zone that was and still is Afghanistan was preferable to the intolerable working conditions at [Defendant]."  (Doc. #60 at 19).  The record evidence, however, directly contradicts this inciting declaration. First, in response to Defendant's interrogatories, Plaintiff stated she "[l]eft MWH Constructors *voluntarily* to pursue career with another company with advancement opportunities."  (Def.'s Ex. F at 9) (emphasis added).  Her response is consistent with her letter of resignation in which she wrote, in pertinent part,

> [m]y eight years of experience with [Defendant] has been extremely rewarding and challenging both personally and professionally.  There are many people I have worked closely with over the years that I have come to regard as a second family.   I sincerely appreciate the effort, experience and knowledge that you [her supervisor] have brought to our team . . . and regret that my opportunity to work with and learn from you will be cut short.  I wish all of the project team and MWH great success.

(Doc. #56-2 at 5).  Such evidence refutes the involuntariness of her resignation.

Second, Plaintiff made an informed and calculated decision to leave Defendant and begin working for Black & Veatch in Afghanistan.  In or around November 2007, Plaintiff and Currie began a romantic relationship.  (Pl.'s Dep. 124:9-12).  As a result, she vacationed to Afghanistan from mid-December 2007 to early January 2008 to visit Currie who was working there at that time.  (Id.).  The purpose of her trip was to understand whether their "relationship was going to be viable" because "[i]t's an awful long distance

to be apart from each other and . . . to be trying to hav[e] a long distance relationship if it's not going to be viable." (Pl.'s Dep. 124:12-18). Approximately two months later, Plaintiff returned to Afghanistan in hopes of deciding whether she wanted to move there and work for Black & Veatch. (Pl.'s Dep. 125:2-23). As a result, the general manner in which Plaintiff discards Defendant's argument that she voluntarily quit to join Currie in Afghanistan is unpersuasive and certainly insufficient to overcome summary judgment. See Lewis v. Aaron's Sales & Lease Ownership, Inc., No. 8:12-cv-01005, 2013 WL 5741780, at *4 (M.D. Fla. Oct. 22, 2013) ("A mere scintilla of evidence in the form of conclusory allegations, legal conclusions, or evidence that is merely colorable or not significantly probative of a disputed fact cannot satisfy a [non-moving] party's burden." (citations omitted)).

Finally, Plaintiff portrays Holt as the principal offender. Interestingly, however, Holt ceased working for Defendant in February 2008, nearly five months prior to Plaintiff's resignation. (Doc. #56-3 at 1). The only evidence Plaintiff has presented is that Holt may have been guilty of poor management, which is not the same as him treating her differently than her male counterparts. See generally Douglas-Slade v. LaHood, 793 F. Supp. 2d 82, 101 (D.D.C. June 22, 2011) (finding plaintiff's grievances pertained to her supervisor's management style, which could not support a hostile work environment claim). Although Plaintiff may have felt resistance from Holt, she has not raised any issue of fact that such resistance was discriminatorily motivated.

In sum, even viewing the evidence in a light most favorable to Plaintiff, she has failed to adduce any facts that her work environment had become so unbearable a reasonable person in her position would have been compelled to resign. Since Plaintiff

17

has failed to demonstrate a constructive discharged, she has not, as a matter of law, suffered an adverse employment action.  Accordingly, Plaintiff has not met the third element of her *prima facie* case of sex discrimination.  See Celotex, 477 U.S. at 322-23 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." (citation omitted)).

B.  Similarly-situated employee

Even if Plaintiff suffered an adverse employment action, Defendant is still entitled to summary judgment because she has failed to adduce any evidence Defendant treated similarly situated male employees more favorably.  When a plaintiff alleges discrimination, she must show the employer treated similarly situated employees who are not in the protected class more favorably.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  To establish a comparator was similarly situated, the plaintiff must show "the quantity and quality" of the comparator's misconduct was "nearly identical" to her own.  See Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 (11th Cir. 2008).  Here, Plaintiff points to no male employee who was constructively discharged.  Without any comparator, Plaintiff has not raised evidence sufficient to allow a reasonable fact finder to conclude she can prove a *prima facie* case of sex discrimination.

In conclusion, Plaintiff was required, but ultimately failed, to offer specific evidence showing a genuine issue of material fact that warrants trial on her claim.  Stating in conclusory fashion Defendant discriminated against her on the basis of sex, without more,

does not simply make it so.   Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Count I of the Amended Complaint.[8]

## III.   Retaliation

In Count II of the Amended Complaint, Plaintiff alleges Defendant retaliated against her after she emailed Holt on August 17, 2007, complaining of sex discrimination (Doc. #60 at 26).[9]   Title VII prohibits an employer from "discriminat[ing] against any individual . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter."   42 U.S.C. § 2000e-3(a).   The McDonnell Douglas burden-shifting framework discussed above also applies to retaliation claims supported by circumstantial evidence.[10]   See Dockens v. Dekalb Cnty. Sch. Sys., 441 F. App'x 704, 708 (11th Cir. 2011) (per curiam).

A *prima facie* case of retaliation under Title VII requires the plaintiff to show that (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.   See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).   For an action to be adverse in the context of retaliation, it "must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a

---

[8] On July 11, 2014, Defendant moved to strike any "compensation discrimination" claim Plaintiff attempted to raise, for the first time, in her opposition to summary judgment.   (Doc. #62).   Defendant argues any claim Defendant compensated her differently because of her sex is improper because Plaintiff neither alleged it in the Amended Complaint nor in the EEOC Charge.   (Doc. #62).   In response, Plaintiff clarifies she "is not seeking to add any cause of action for Equal Pay or otherwise to the Amended Complaint."   (Doc. #68 at 2-3).   The Court, therefore, will deny Defendant's Motion to Strike Any Plaintiff Claim for "Compensation Discrimination" (Doc. #62) as moot.

[9] The Court's analysis of Plaintiff's retaliation claim under Title VII applies equally to her claim under the FCRA.   See Harper, 139 F.3d at 1387.

[10] Plaintiff has neither offered direct evidence of retaliation nor argued that such evidence exists.

charge of discrimination." Burlington, 548 U.S. at 57. Additionally, "Title VII retaliation claims require proof that the [employer's] desire to retaliate was the but-for cause of the challenged employment action." Univ. of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S.___, 133 S. Ct. 2517, 2533 (2013). Again, summary judgment is appropriate if the plaintiff fails to satisfy any of the elements of a *prima facie* case. See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998).

Here, the undisputed record evidence, viewed in the light most favorable to Plaintiff, does not establish a *prima facie* case for retaliation. The instances of alleged retaliatory conduct Plaintiff points to, most of which are untimely, are nothing more than a series of ordinary workplace tribulations and do not raise to the level of an adverse employment action. For example, at some point, Fandrich instructed Plaintiff that a certain amount of rock had to be installed every day in order to meet the project's design and told her "this is how much progress you need to get, you're not managing the contractor." (Pl.'s Dep. 133:14-134:15). Although Plaintiff interrupted Fandrich's instructions as him overriding her decisions and purposely embarrassing her, a reasonable jury would not. Also, Plaintiff contends Fandrich refused to give her an annual performance evaluation at the end of 2007. (Pl.'s Dep. 135:11-21). Although Roy Bumpass ultimately gave her an in-person review, Plaintiff remained unsatisfied because he was apparently unprepared and called her "arrogant and unapproachable." (Pl.'s Dep. 135:21-136:4). Plaintiff's mere dissatisfaction with the performance evaluation does not translate to an adverse action.

Plaintiff's best argument in favor of unlawful retaliation is being subjected to a drug test. Her position, however, is attenuated at best. Defendant presented evidence that an

independent third-party company selects employees at random and administers drug tests on a quarterly basis.  (Rowley Decl., ¶ 14; Doc. #56-2 at 6).  At the same time Plaintiff was selected for the drug test, nine other employees were randomly selected.  (Doc. #56 at 19).  Plaintiff also testified that she had no knowledge of the drug testing protocols or who even selected the employees to be tested.  (Pl's. Dep. 241:7-22).  Plaintiff has unconvincingly attempted to link the drug test and the discrimination complaint she had made more than five (5) months earlier.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment where the plaintiff "failed to present evidence from which a reasonable jury could find any causal connection between her April 2005 complaint(s) of sexual harassment and the termination of her employment three (3) months later").  Simply, Plaintiff falls far short of showing that her selection for the drug test was so harmful that it would dissuade a reasonable employee from complaining of sex discrimination.  See Burlington Northern, 548 U.S. at 68.

In any event, Plaintiff has not established that any "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or action of the [Defendant]." Nassar, 133 S.Ct. at 2533.  Under the "but-for" causation standard, a plaintiff making a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  Id. at 2534.  The plaintiff always has the burden of persuasion "to proffer evidence sufficient to permit a reasonable fact finder to conclude that discriminatory animus was the 'but-for' cause of the adverse employment action."  Sims v. MVM, Inc., 704 F.3d 1327, 1332 (11th Cir. 2013) (reconciling "but-for" causation and the McDonnell Douglas framework in ADEA case, and affirming summary judgment where appellant could not establish that discriminatory

animus was the but-for cause of his termination).  Here, to find in Plaintiff's favor, a jury would have to conclude but for her discrimination complaint in August 2007 she would not have been drug tested.  No reasonable juror could reach such a conclusion.

Accordingly, for the reasons stated, summary judgment in favor of Defendant is appropriate on Count II of the Amended Complaint.

## IV.  Backpay damages

Finally, Defendant argues Plaintiff is not entitled to backpay damages, as she was immediately employed after she resigned from her position with Defendant.  (Doc. #56 at 2).  Since the Court dismisses Plaintiff's discrimination and retaliation claims as a matter of law, it need not address the merits of Plaintiff's claim for backpay.

Accordingly, it is now **ORDERED**:

(1) Defendant MWH Constructors, Inc.'s Dispositive Motion for Summary Judgment (Doc. #56) is **GRANTED**.

(2) Defendant MWH Constructors, Inc.'s Motion to Strike Any Plaintiff Claim for "Compensation Discrimination" (Doc. #62) is **DENIED as moot**.

(3) Defendant MWH Constructors, Inc.'s Motion In Limine (Doc. #71) is **DENIED as moot**.

(4) The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida this 25th day of July, 2014.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All parties of record